All right, I see that we are ready to proceed with the next case. It is Maria Teresa Pupo versus the Commissioner of Social Security. Joseph Teplicki is here for Ms. Pupo, along with Catherine Palacios-Paredes. And Shannon Fishel is here for the Commissioner. And Mr. Teplicki, you may proceed with your argument. May it please the Court, Your Honor. I am Joseph Teplicki for the claimant. I will be addressing the appellant's argument one, dealing with the borderline aid situation. My co-counsel, Catherine Palacios, will be addressing the other argument. The issue presented here simply stated is whether or not the administration is free to ignore a command in the source review regulation. In the case presently before this Court, the claimant was two months and five days away from attaining the age of 55 when the AOJ issued the decision on her case. The AOJ found in its notice of decision that the claimant has no past relevant work, that she is not able to communicate in English, and is considered in the same way as an individual who is illiterate in English, which meant that she had education in history with the most adversity that a claimant could have had at the time. Thus, pursuant to the SSA Medication Vocational Guidelines, also known as the GRID rules, if she would have been treated as a 55-year-old individual, a finding of disabled would have been directed. However, because she was not yet actually 55 years of age, the AOJ did not treat her as being age 55, and thus her case was not approved. Regulation 416.963 says, if you're within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or a decision that you are disabled, we will consider whether to use the older age category after evaluating the overall impact of all the factors in your case. This is the whole key to the case, because it mandates the AOJ to consider whether to use the older age category, which the AOJ in this case never did. This is further made clear in SSA's Internal Policy Manual, known as the HALEX, which says that if a borderline age situation exists, the AOJ must decide whether it is appropriate to use the claimant's chronological age or the higher age category. This is HALEX I-2-2-42. I stress the word must is in the HALEX. The HALEX then goes on to state that the AOJ will explain in the decision that he or she considered the borderline age situation, state whether he or she applied the higher age category or the chronological age, and note the specific factors he or she considered. The HALEX explains that the AOJ will take a sliding scale approach when determining which age category to use, meaning a claimant should be more likely to be put into the higher age category the closer she is to crossing the borderline age. The HALEX goes on to explain… Mr. Tabluki, let's assume that you're correct, but the Commissioner says that even if the AOJ erred by failing to address the consideration of the borderline age situation, that the error was harmless because your client neglected to show evidence of additional adversities. What's your response to that contention? Well, actually, that actually gets into the next part of the HALEX. The HALEX says that the claimant is basically… the judge is supposed to look at the claimant's residual functional capacity combined with age, education, and work experience as examples of factors that the AOJ should consider. In this particular case, the claimant was found to be illiterate, which is the lowest category of education the person can have, and was found to have no work history at all whatsoever. Within the ranges of the aggrids, there is, for instance, in her case, it would have gone from limited education, which would be ninth grade, all the way down to illiterate. She's down at the lower end of the range. That's a special factor. There's also the fact that she actually had absolutely no work history whatsoever. In fact, there is a special vocational guideline that says that if a claimant is 55 years old, which she would have been in two and a half months, has no more than a limited education, has no past work, if she has simply one severe, any severe medically determinable impairment, she's to be found disabled. The regulation goes on to make clear that in such a case, they won't even assess residual functional capacity. They won't even look at the grades. Her case is considered to be so adverse, her unique circumstances of being no work history whatsoever, and having less than limited education, or limited education, or no more than that, that that's defined as already a situation where she should automatically get disability without even having to prove residual functional capacity at age 55. The POMS 25015.006 actually gives an example of a case factor combination that would support using the higher age category. And it says 55, 54 years and six months old. She was older than that, who has medium residual functional capacity, which she had, was a fourth grade education, no past relevant work. She was found to have illiterate and no past relevant work, which is lower than that. That person should be considered for the borderline age according to the POMS. So as far as the harmless error goes, their own policy says that this is a classic case of a person who should be put in the higher age category. Please remember that the claimant in this case before the court was just like I said, two months and five days away from being age 55. In the case before this court, the AOJ decision makes absolutely no reference to the fact that the claimant is a borderline age situation. The appellant asserts that the regulation with its mandate that says we will consider whether to use the older age category in borderline situations is mandatory. Now, in the Fifth Circuit Court of Appeals, in the case of Schofield v. Commission, the court held that the AOJ had no discretion to ignore the command in the regulation ordering the AOJ to consider whether to use the older age in borderline and to ignore the command would never be harmless error. The Schofield Court also noted decisions from its sister court, including the Eighth, Tenth, and Third Circuits supported their decision, and the Ninth Circuit said the AOJ must show borderline situations that she considered whether to use the older age category. The claimant respectfully requests that this court join its sister circuits in supporting the same conclusion. Thank you, counsel. Thank you, Ron. We'll hear from Ms. Palacios-Paredes. Thank you. Good morning. May it please the court, Katherine Palacios, on behalf of the appellant, I will be addressing the remaining issues that the appellant raised. First, with respect to new and material evidence, at issue here is whether the evidence submitted to the appeals counsel was new, material, relating to the period at issue, on or before the date of the hearing decision, and fourth, whether it showed a reasonable probability that the additional evidence would have changed the outcome of the decision. The commissioner appears to not contest the first three elements, but does note that there was no reasonable probability that the additional evidence would have changed the outcome, arguing that that element was absent. The commissioner first argues that the AOJ already expressly considered evidence of the claimant's stress incontinence, her diabetes, and related symptoms, and that she had complained of hip and back pain in assessing the claimant's claim and functioning. But for one, there is no standard requiring the claimant prove a never-before-considered impairment. Moreover, the judge's failure to find that the claimant's urinary incontinence was a severe impairment is problematic because, in part, the new evidence shows it was of such a severity as to necessitate surgery. The commissioner readily acknowledges that the claimant reporting having to use five pads a day, and these additional limitations relating to such an impairment could reasonably include reduced lifting and carrying weight. And she's had the surgery, and that has improved, is that correct? It was after the period at issue that the AOJ addressed, so there may be even a closed period of disability, depending upon whether... This case is complicated because that particular condition was addressed and was ameliorated for better. It was successful surgery. That would limit the disability timeframe to the extent it was caused by that particular issue, is that correct? I would reserve judgment on that from our perspective. We don't have updated medical records for this case. The medical record extends through the evidence that was submitted to the Appeals Council. We don't necessarily know that in the long term her surgery was successful to the extent that it would not give rise to any further limitations. I'll try this. I thought, at least for right now, the surgery when it was 2016, the condition that was causing incontinence was ameliorated, at least for that period of time. Is that wrong? Perhaps, Your Honor, but we don't have evidence subsequent to that. Counsel, let me ask you something related to that. When I was going through the notes, I noticed that there's an August 2, 2016 note that says that Ms. Pupa was told to take, quote, pelvic rest and no heavy lifting, unquote. It seems like maybe that wasn't considered by the agency because the vocational expert actually included some lifting, I guess, that was substantial. It seems like, I don't know if you want to address that. Well, yes, the ALJ in this case found in his residual functional capacity assessment finding that the claimant was capable of medium exertional work. Medium exertional work entails lifting and carrying up to 50 pounds. I mean, that is a significant amount of weight. One could reasonably conclude that somebody with urinary incontinence who herself complained that lifting and carrying a significant amount of weight induced accidents to occur. And medically, there's a relationship between putting pressure on the upper body and the pelvic region. And one could reasonably conclude there's a relationship and that there would be limitations that arise from such an impairment. And the fact that the ALJ found that she could lift and carry 50 pounds, I mean, 50 pounds is, you know, five or six year old child, and it's 50 pounds for up to and including a third of the day. So that would be more than two hours out of a typical eight hour workday, five days a week, you know, four weeks out of a month. That is a lot of weight to expect somebody with that particular impairment to lift and carry on such a regular and consistent basis. I see that I'm over my time, but I would be happy to continue to address any questions that the panel may have for me. Thank you, counsel will hear from the special on behalf of the commissioner. Good morning and may it please the court Shannon official on behalf of the commissioner. I'm turning first to the question. All right. Excuse me. Turning, turning first to the question of the step five finding. And I want to back up a bit to give a little context to what happens at step five. As you well know, it's an evaluation of a claimant's ability to perform other work in the national economy. But there are two main ways that the commissioner goes about meeting the burden at step five, and the first way involves the medical vocational guidelines which we often call the grids. Now, what the grids involve are the using certain factors the vocational factors including age, education level, and past relevant work history, as well as the exertional elements of the residual functional capacity finding the ALJ uses these and plugs it into a table matrix, and then there's a statutorily directed finding that results and that finding may be disabled or not disabled. Now this court has stated that when there is a borderline age situation and the grids are being applied. The age factor cannot be applied mechanically within the grids and the claimant is to receive an opportunity to proffer evidence and that evidence needs to show that the claimant has a lesser ability to adapt, then her peers with regard to performing other work in the national economy. Now the other way that the commissioner can meet the burden at step five is to the use of vocational expert testimony, and this is generally preferred because of vocational expert can give an individualized assessment based on all the factors involved in the claimant's case. And here, the ALJ relied on a vocational expert because there were non exertional limitations and the result, excuse me, residual functional capacity assessment related to the location The vocational expert here was only about her psychological state. It was a psychologist, the RFC expert was a psychologist, I believe, and I was concerned that there was no physical, there was no locational expert who evaluated for physical condition. Am I right on that? So the vocational expert just evaluates the ability to perform other work in the national economy, based on the residual functional capacity finding. Now with respect to determining the residual functional capacity finding, I think you are correct, there was not a medical doctor who does the RFC as to physical ability. You had a PhD doctor do a locational evaluation because she's got depression and other mental health issues. And they did on that, but nobody did really the physical part, it seemed to me. Well, I know you say there's medical evidence and the ALJ can make it from the medical evidence. I got that part. Correct, correct. ALJ did it from the medical evidence. Yes, the ALJ relied on the medical evidence and did not rely on a medical opinion specifically for assessing the physical residual functional capacity, but of course the regulations do not require the ALJ. I know, but isn't it true in most cases we have also a doctor opining and Commissioner puts in evidence from a doctor as to the RFC. In some cases, but not in all, it's at the discretion of the ALJ. If the ALJ feels that the evidentiary record is incomplete and that a consultative examination would be useful in making the determination, then the ALJ can order that. So we do not see that in all cases. It does show up somewhat frequently, but again, that often shows up in cases where there is not substantial physical evidence in the record and here we have several years of objective medical record. So, if you wanted to require that, how would you say that a medical independent medical exam. We typically refer to it as a physical consultative examination is the typical language you see in the regulations. A physical consultative examination to determine what? To essentially evaluate her physical abilities with respect to functional limitations arising from her medical impairments. Let me be candid with you. This ALJ did that RFC, and he said she has the RFC to perform medium work, which we've already heard is up to 50 pounds. Correct. And it's a long time since I've seen somebody in this shape, they say medium work, you normally have light work, and he says medium work without even a medical doctor doing an RFC. Well, respectfully, what we're looking for is substantial evidence and as you well know that is not a high standard it's more than a scintilla but it's no more than a reasonable mind would find is adequate to accept the conclusion. And here, the physical objective examination findings are consistently unremarkable including she doesn't have any gait abnormalities there are no neurological deficits. She shows full motor strength and range of motion in her. I think you're right, his problem was that there was no objective medical evidence of any physical limitation. And I would also point out that she received exceptionally conservative care and the handful of times that she did complain of musculoskeletal pain or back pain. Her doctor simply directed her to rest for a few days use heat therapy and take over the counter medication is needed. This isn't one of those cases where we see extensive and significant treatment for complaints of back or musculoskeletal pain and so I do think that in this particular case there is substantial evidence as it exists in the record before the LJ to support the finding for medium level work. I also think that substantial evidence supports the step five finding, which again was made before you go, how do we know that the decision would be the same. If the commissioner had considered the older age category. Well, Your Honor, I think what it comes down to is that under the 11th Circuit precedent claimant has the burden to show through an evidentiary proffer that she has a lesser ability to adapt than her peers. Now this case held this court held and Patterson be Bowen that in making that proffer the claimant cannot rely on evidence related to her education, or her past work history, or her residual functional capacity here claimant points to two main items which are her inability to speak English and her lack of past relevant work or past work history at all. I guess what I guess what I'm trying to figure out is, is the regulations expressly state that if you are within a few days or months of reaching an older age category. It says the commissioner will consider whether to use the older age category and the commissioner did not consider whether to use an older age category. In this case, that's mandatory language. Well, you are correct that there is no articulation in the decision, but those regulations also provide that the LJ must consider this. When using the higher age category would result in a finding of disability and the place where that would occur is when the LJ uses the grids because the grid statutorily direct to finding. And here we have vocational expert testimony which was an individualized assessment of claimants abilities to perform other work based on not only her factors, her vocational factors in RFC, but also, you know, using the vocational experts judgment your professional experience. That's not what the third and the eighth circuit so based on show field it does appear that the Fifth Circuit implied that there is a requirement, regardless of whether using the V or the grids, but you know, under 11th Circuit precedent again this would ultimately be harmless error because even if the LJ should have articulated, whether or not the higher age category should have been used claim it still had to show an inability to adapt or a lesser ability to adapt than her peers and she cannot make that showing under this court's precedent, because she seeks to rely on information that was already before the, the LJ and was already considered with respect to her vocational factors. And so, even if you know this court determines that she was required the LJ was required to make this finding sending this case back wouldn't result in a change, because her evidence is not the type of evidence that is required to make the showing of the inability or lesser ability to adapt. But again, you know this court has addressed a remarkably similar situation in its unpublished decision of Miller versus Commissioner of Social Security at 241 federal appendix 631, and in addressing this question. This court has highlighted that it's simply theoretical in settings where a vocational expert testimony was used to establish the step by finding, and I would argue that, you know, this is an opposite of what shown field suggests, and that under the. This court's precedent that in fact the LJ is not required to articulate a finding regarding a borderline age situation when relying on the vocational expert testimony. And again, this is supported by the language of the regulations which require the LJ to make this finding when ultimately applying the older age category would direct finding of disabled. So, in this case we have vocational expert testimony given a response to an accurate hypothetical question and that amounts to substantial evidence in support of the step by finding. Now, turning to the question of the additional evidence that claimant submitted to the appeals council as found as argued in the brief this simply doesn't allow for a reasonable possibility that there would be a different outcome and I know that she emphasizes her urinary incontinence but I would point out that during the hearing before the LJ when she was asked the reasons why she was unable to work. She did not mention urinary incontinence or trouble with that situation. What she mentioned was constipation and discomfort that came from that which is remarkably different from urinary incontinence. And while it's true that there was some evidence before the LJ regarding her complaints of this condition, you know the LJ acknowledge that evidence, but frankly, there was no objective findings or no particular statements by claimant that suggested this was a disabling condition. Yes. What about the August 2 2016 record from her hospital visit, where it says she was told to take pelvic rest and have no heavy lifting. Well, with respect to that single record that in and of itself does not suggest there is a lack of substantial evidence for the LJ finding in particular because it may show that she had exacerbated symptoms on that one occasion, but there's nothing throughout the records showing that she was receiving that type of guidance or directives at earlier periods of time and in fact it appears that at earlier periods of time she elected to proceed with very conservative care and treatment which mostly appeared to involve exercising pelvic floor muscles to strengthen and support the bladder she didn't. She did not seek the surgical correction until much much later so there's just nothing in the record before the LJ to support significant limitations of function related to what about as of that time, as of that time, potentially, but again, we have a single record with this directive in it and then she subsequently has corrective surgery which we, I'm assuming was successful perhaps it was not we don't have those records but so it would be a very very limited period and remember there's a durational requirement. She would need to show that this condition lasted 12 months or longer, and that this condition rendered her disabled for that 12 month period. So I do not believe that that record or even beginning if we look at that period of time to the point of surgery would be sufficient to establish that durational requirement for purposes of the disability finding with respect to the other evidence that was there was also, I believe, a prescription for orthotics and a single document notating diabetic neuropathy, but throughout the period of time before the LJ. There was no treatment for diabetic neuropathy and there were no abnormal neurological findings. There are several documented treatment findings in the record where she had fully normal monofilament foot examinations indicating that she wasn't experiencing diabetic neuropathy symptoms at that point. And so, again, that evidence is just not sufficient to undermine substantial evidence in support of the LJ's finding, and this doesn't warrant a remand for further consideration. So, as this court well knows this case is governed by the substantial evidence issue or standard, which really does not present a high bar we know it's more than a scintilla but it's not even a preponderance it's really no more than such relevant evidence as a reasonable mind might accept as adequate to support the LJ's conclusion. And here I think in the very thorough decision by the LJ which discusses these treatment records at length and acknowledges both favorable and less favorable findings by the doctors, the LJ readily satisfied the substantial evidence standard and because the LJ also properly complied with the regulations, I respectfully ask this court to affirm the decision. So if the panel has no further questions I will rest on the commissioners brief. Thank you. Thank you, Miss special will hear from Mr. Thank you, Your Honor may please record. I just want to talk about real quickly. In case it was missed, there is actually a physical residual functional capacity for build out by the claim is treating doctor, which had her at way below sedentary, which the LJ rejected completely. I just want to, and that's an exhibit. I'm aware that he said he's discounted all that because there's no objective findings, but normally the government has a has their own expert in these cases, and they don't hear the LJ just made the findings himself, but maybe I'm maybe I'm wrong about this. You're correct, Your Honor. And now we're going to the RFC biomedical doctor, the LJ made the findings based on the overall medical record and then discounted the medical doctors exactly he interpreted the raw evidence himself which he really isn't supposed to do because he's not a doctor. Now, going addressing her issue about the Patterson versus commissioner case, but first it should be noted the claim and actually won that case. Now, regarding her assertion that evidence concerning the claim is education work experience residual functional capacity. Don't relate to the question whether the payments ability to adapt to new work environment is at the level requirements of the grids, which is actually stated a bit contradicting in the Patterson case. That's actually the polar opposite of what's required under the policy manual the house which is specifically list as the only examples that it gives the should be considered as age, education work experience and residual functional capacity. Once again, that's how it's I to dash to 42 see, according to the government's position. If the LJ follows the Alex, then he's in violation of Patterson, and if you if the LJ follows Patterson, he's in violation of the Alex. Now in the Patterson case, the, the Patterson wrote that in this case the climate had carpal tunnel syndrome has significantly limited her manual dexterity and grip strength in her hand, and this is new evidence that would create a difficulty in adapting to the new situation. But then, basically, it went into the footnote and said of course evidence that is relevant to a claimant's residual functional capacity may also be relevant to the question of whether the claimants ability to adapt to new environment is less than the level presumed. He said over here for instance in the instant case in the Patterson case the left car whole tunnel syndrome was related to the ability to live but then also dexterity. Now, if the commissioners looking for another additional factor that's outside of those what we have the urinary incontinence. That's an additional factor. If for no other reason the appeals counsel should have sent it back to find out if that would have made a difference on the borderline age situation. Can I ask you about the RC that her doctor did you said he said she could do sedentary work no no he said that she was below sedentary which means she could do no work at all whatsoever on a continuous basis, which would have been an automatic finding of disability for any question on page, 18 of the 19 page ALJ order. He does refer to that she was born in 1961 is 49. And he does say the claimant subsequently changed age category to closely approaching advanced age and sites that CFR 416 963. Yes, Your Honor. Borderline age. Right now actually what he does acknowledge it. It doesn't didn't seem to apply it, but he does acknowledge it. And actually no Your Honor, in that case, he's talking about that the claimant was at 49, and then changed to 50. It wasn't acknowledging that at this point she was 54 and 10 months and was about to go to 55. It was acknowledging. I say, you completely ignore that she was going to be 55 in the decision. Well what is this Wednesday of this decision was she about to be 50 to 55 or she was going. She was 2017. She was exactly two months and five days away from turning 55 it should be noted, by the way, that she made this decision. Yes, on the decision. She was two months and five days away from the age of 55, which, according to the palms says that if for someone with a higher education fourth grade, and who's six months away, that should be a case that should be considered for the borderline age situation. Scofield versus Saul, how far away was the claimant in that case, away from 55 years of age. I'm not exactly sure. I know was less than six months. If I'm correct. But I don't know I don't know exactly how it would but it would have been within the borderline age situation where I imagine which would have been six months or less which is the borderline age situation to source security is considering. At the time of this decision she was 50. You're saying she was a few months away from 55. She was two months and five days away exactly from being 55. Okay, but in that what he's saying. She was 49. When the application was filed. And he's saying she's subsequently age changed age category closely advancing. Right, the age category would be 50 to 55, 50 to 5455 would be advanced age. So what he's saying is that she applied and then she became closely approaching advanced age. So he's treating her as somebody closely approaching advanced age. He ignores the fact that she now is about to turn 55 and will actually be advanced age. And the CFR for that is what. That's the same for one 6.963, which is the one that has the borderline age situation. Yes, I don't know if that's accurate because he is say she's closely approaching it, but that must mean. I'm sorry, he actually writes on there, she was 18 to 49 on the date of application, and then she subsequently changed categories to closely approaching advanced age which would be the 50 age group. He's acknowledging that she's no longer 18 to 49 and acknowledging that now she is the 50 to 54 age range. He never goes beyond that to discuss any possibility of her being of the advanced age. And in the 50 to 55 she's now close to 55 is what you're saying. Exactly. 50 to 54. He says the basis she's, he doesn't he says she's in the 50 to 54 never acknowledges that now she's going to be almost 55 he never ever acknowledges that in any way whatsoever. And it's really all the extra language with the commissioner says that it's only the regulation says that it should only be in cases where it's clear where the borderline is going to put none of that is there actually the statute of the regulation is very very clear. If it's a borderline age situation, we did the AJ will consider whether or not to apply the older age category, it's a mandatory language. There's no. Have you found a new application, is there a new one pending because she has had progression here. I mean, problem in this case is, this is started a long time ago. And a lot has happened. I mean, to be honest, Your Honor, she already filed again and was approved a big, you know, immediately, because you know I mean it was such a clear cut case, but she was approved from the new application going forward. We still have her age now she probably would be able to qualify with everything. Exactly. What day is she getting it from. I'm not exactly sure but you know she would have gotten it automatically using the special vocational category which says that she doesn't even have to have a residual functional capacity evaluation. She filed that application she probably got it from that day. She got it from the day that she filed it would have been after she turned 55 I don't know the exact date I'm sorry Your Honor I don't have that. To let me aren't we going beyond the record in this case aren't we found by the. These issues in our record. Yes, Your Honor, I was just answering the judges question Your Honor. I agree that's not. She was curious and I knew the answer Your Honor so I gave it to her. Well he was arguing about the age category and I just wanted to follow a new application based on the age category, because she's now over 55. Yeah. If I'm over my time if there's any additional questions I'll be happy to answer them if not, then I would like possible Catherine Palacios could have whatever she wants to do for rebuttal. He has already. Yes. Yes, Judge, thank you. A couple of items that I just wanted to briefly address the miss official notes that the factors of age education and past work cannot be looked at to assess whether there is an additional adverse factor, and yet the agency's own policy states in palms that there are examples of factors that may impact the case. This subsection provides examples of a case factor combinations combinations that could support the use of a higher age category in a borderline age situation. Example number three provided by the agency states where the claimant is 54 years and six months old has a medium RS RC fourth grade education, and no past relevant work. That example is given by the agency, relying on age education and RC as factors and past work as the combination of factors that could could support the use of a higher age category and I think the point that we are trying to impress here is that there is absolutely no indication in the LG decision that he even considered the borderline factor in the first place, and whether the claimant had the opportunity to proffer these additional factors is still yet to be seen. I have 30 seconds left so I'll address one more thing briefly, Miss Mitchell was arguing that the evidence does not support the determination that she was any more limited that the claim it was any more limited than a medium RC, but we have objective evidence on record. For example, x rays confirmed a history of cervical degenerative spondylosis at multiple levels x rays of the thoracic spine revealed multi level degenerative spondylosis, the record documents the claimants impairments included back pain with fracture of the mid left clavicle when she was hit by a pickup truck. She also had moderate lifting and spurring at C four levels and see six levels with diminished space in the cervical spine. There are a multitude of findings that plaintiff. I'm sorry appellant outlines in the briefing, and I'll just wrap this up very quickly. That support her allegations that she is more limited than a medium, a full medium lifting and carrying 50 pounds a third of the day a third of the work week, or see what support and the judge, ultimately discounting the opinion of her trading source without under the old regulations is also a violation of that. And they're very much related issues, but as a package as a whole, if we find reason to If we find reason to believe that the RFC is not supported by the record that greater weight should have been given to the trading source opinion, then the whole idea that she could even perform at that level of work on a sustained basis goes out the window. Thank you. Thank you. Thank you. And Mr. And the special. And that concludes our docket for this week, and this court is adjourned.